CONNECTICUT TELEVISION, INC. *v.* PUBLIC UTILITIES COMMISSION ET AL.

OUTLET/B-T COMPANY *v.* PUBLIC UTILITIES COMMISSION ET AL.

DUCCI ELECTRIC COMPANY, INC. *v.* PUBLIC UTILITIES COMMISSION ET AL.

ALCORN, HOUSE, THIM, RYAN and SHAPIRO, Js.

Argued March 11—decided April 22, 1970

*W. Robert Hartigan,* for the appellant (plaintiff) in the first case.

*Bourke G. Spellacy,* with whom, on the brief, were *Stuart N. Updike* and *Thomas W. DeMille,* for the appellant (plaintiff) in the second case.

*Marcia B. Smith,* with whom were *Paul Smith* and, on the brief, *Alexander M. Hart,* for the appellant (plaintiff) in the third case.

*Joseph P. Cooney,* for the appellee (defendant TelePrompTer Corporation) in all three cases.

*John L. Collins,* for the appellee (defendant Community Television Systems, Inc.) in all three cases.

*Bruce C. Mayor,* with whom, on the brief, was *Martin S. Michelson,* for the appellee (defendant Laurel Cablevision, Inc.) in the third case.

*Morgan K. McGuire,* for the appellee (defendant Vision Cable Corporation) in the second case.

*Hugh M. Joseloff,* for the appellee (defendant Grossco C.A.T.V., Inc.) in the first and third cases.

*Frank R. Odlum,* assistant attorney general, with whom, on the brief, were *Robert K. Killian,* attorney general, and *John G. Hill, Jr.,* assistant attorney general, for the appellee (named defendant) in all three cases.

*Alfred F. Wechsler* appeared for the appellee (defendant Laurel Cablevision, Inc.) in the first and second cases.

*James R. Healey* appeared for the appellee (defendant Waterbury Community Antenna, Inc.) in the first and third cases.

*Robert A. Beizer* and *Theodore A. Shmanda* filed a brief as amicus curiae but did not argue the cause.

ALCORN, C. J. The plaintiff in each of these cases has appealed from the judgment of the Superior Court, which dismissed an appeal taken to that court from a decision of the public utilities commission. Although based upon separate records, the cases have been briefed and argued together because of the similarity of issues.

In 1963 the General Assembly adopted Public Act No. 425, which became effective June 24, 1963, and is now chapter 289 (§§ 16-330—16-333) of the General Statutes (Rev. to 1966). The chapter requires

the issuance of a certificate of public convenience and necessity by the public utilities commission, hereinafter called the commission, as a prerequisite to the construction or operation of a community antenna television system, commonly known as, and hereinafter called, CATV. Such a system is defined as "any system operated in, under or over any street or highway for the purpose of providing antenna television service for hire." General Statutes (Rev. to 1966) § 16-330. As a prerequisite to the issuance of a certificate by the commission, a public hearing is required, and, as a basis for the issuance of the certificate, hereinafter called a franchise, the commission is required to "take into consideration the public need for the proposed service, the suitability of the applicant or, if the applicant is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested." General Statutes (Rev. to 1966) § 16-331 (b).

Following the passage of chapter 289, many applications for CATV franchises were filed with the commission in which the applicants sought to serve various towns or groups of towns. Three applications were withdrawn prior to hearing, and, following protracted hearings, the commission dismissed or denied others and granted franchises to seventeen applicants.

The plaintiff Connecticut Television, Inc., is a licensee of television station WHNB-TV Channel 30 in New Britain, and it filed two (CATV) applications in which it sought franchises to serve eighteen towns. Both of its applications were denied.

The plaintiff Ducci Electric Company, Inc., applied for a franchise to serve the towns of Thomas-

ton, Torrington and Winsted, but the commission granted a franchise to Ducci for the towns of Barkhamsted, Goshen, Harwinton, New Hartford and Winchester and granted a franchise to another applicant for the towns of Torrington and Thomaston.

The plaintiff The Outlet/B-T Company is financially affiliated with television station WJAR-TV in Providence, Rhode Island, and it applied for a franchise to serve forty towns. The application was amended to seek a franchise for the towns of Groton, New London and Norwich. The commission granted a franchise for the towns of Groton, Stonington (except the Village of Pawcatuck), Ledyard and North Stonington and thereafter reopened the hearing and revoked the franchise.

The plaintiff Connecticut Television, Inc., hereinafter called Television, appealed from the decision of the commission to the Superior Court, claiming, essentially, that a franchise had been wrongly denied it solely because it was a CATV applicant financially affiliated with a television broadcasting station. The Superior Court dismissed the appeal. In its appeal from the judgment of the Superior Court, Television claims that the commission has failed to set forth basic facts to support its decision or to permit a review of its decision; that the commission acted illegally, arbitrarily and without statutory authority in refusing to grant a franchise on the ground of the common ownership of broadcasting and CATV facilities; that the commission lacked power to deal with an issue of common ownership because the federal communications commission has preempted the field; and that the commission failed to weigh the qualifications of the respective applicants pursuant to statutory standards.

In the appeal from the Superior Court judgment

taken by Ducci Electric Company, Inc., hereinafter called Ducci, the claim is that the commission failed to set forth basic facts to support its decision or to permit a review thereof; that the commission acted unlawfully, arbitrarily, in abuse of its discretion and without support in the evidence by granting a franchise to that plaintiff in areas for which it did not apply and in denying a franchise in two of the towns for which it did apply; and that both the commission and the court denied that plaintiff due process of law.

The plaintiff The Outlet/B-T Company, hereinafter called Outlet, asserts in its appeal from the Superior Court judgment that the commission has failed to set forth basic facts to support its conclusion and to permit a review of it; that Outlet was denied due process of law by the commission's refusal to hear certain evidence and by its failure to disclose the common ownership standard which it applied in first granting and later revoking Outlet's franchise; that the commission illegally applied the common ownership of CATV and television broadcast facilities as a standard for the denial of a franchise, and that, in any event, it failed properly to apply such a standard; and that the commission illegally invaded a field preempted by the federal communications commission.

All interested parties have been free to participate in all cases from the outset. Following the passage of the 1963 statute, the commission was confronted with the many applicants for franchises to serve seventy of the 169 towns in the state. Many applicants sought franchises in the same towns, and the size and configuration of the areas applied for varied widely. The commission undertook to treat the problem thus presented as a unified whole. Con-

sequently, a notice of hearing was issued under date of July 13, 1964, to all applicants as of that date, followed by a further notice dated September 28, 1964, which included four additional applicants, and assigning the various applications for hearing on specific dates. Procedural rules were established for the offer of evidence by all proponents and the right of cross-examination by all parties in interest. All applicants were required to make all exhibits available to all interested parties, the requirements of General Statutes (Rev. to 1966) § 16-331 were set forth, and applicants were warned of their burden to prove their ability to comply. Thereafter the hearing continued, during ninety-three sessions, for nearly three years until the commission issued the decision and order appealed from on March 21, 1967.

In the appeals taken to the Superior Court by Television, Ducci and Outlet, the members of the commission and all applicants to which franchises had been granted, as well as some others not necessary to mention, were made parties and were fully heard by the court on the record certified by the commission.

In the appeals to this court by Television, Ducci and Outlet, the commission and the applicants to which franchises were granted by the commission appear as defendants. The record certified by the commission to the Superior Court consists of 9481 pages of testimony, the orders of the commission previously described, and the exhibits submitted by all applicants.

From the record thus certified, the trial court, in substance, reached the following identical conclusions in the three cases now before us. The function of the court was to determine from the record

before it, and without substituting its own discretion, whether the commission had acted illegally or in abuse of its powers. The facts found by the commission and its stated conclusions were sufficient to permit a review of its decision from the record. The commission's grant of a franchise among applicants, all of which it found to be equally qualified by management, financial and performance standards, was an administrative matter and not subject to review by the court. The commission followed the standards prescribed by General Statutes (Rev. to 1966) § 16-331 and, in determining the suitability of the applicant, considered biographical data and the question whether the public interest would be better served by an independent CATV system than by one financially affiliated with a broadcasting station. The commission considered each applicant's financial and technical responsibility and found each successful applicant to be financially and technically competent. The denial of a franchise to these plaintiffs was not discriminatory and did not deny due process. All applicants were notified that they might be required to accept franchises for towns for which they had not applied, and no objection was made although opportunity for objection was given, and the commission did not act illegally or abuse its discretion in granting franchises for towns for which an applicant had not applied. No action by the federal communications commission prevented the commission from considering whether the common ownership of a broadcasting station and a CATV system was contrary to the public interest. There was no discrimination in refusing to grant a franchise to these plaintiffs to operate a CATV system in an area within which each provides television broadcasting services. The commission

did not otherwise abuse its discretion or act illegally, unreasonably or in excess of its statutory powers.

In the case of Outlet, the commission had, in its order of March 21, 1967, granted a franchise to Outlet for the towns of Groton, Stonington (except the Village of Pawcatuck), Ledyard and North Stonington. On May 18, 1967, the commission issued a notice of a hearing to require Outlet to show cause why the franchise should not be revoked or altered on the ground that study of the record indicated that Outlet had a substantial financial interest in a television station the signals from which would compete in the franchise area. A hearing was held and the franchise was revoked on January 24, 1968. Outlet appealed from that revocation, and the Superior Court concluded, in addition to the conclusions common to all three cases summarized above, that the revocation was based on evidence produced at the original hearing; that the commission could reopen and revoke the prior order as it related to Outlet although appeals from portions of the order affecting other applicants had been taken by those others; that the commission properly refused to hear the evidence offered by Outlet at the reopened hearing; and that there was evidence from which the commission could conclude that Outlet's television station did broadcast a clear signal over the area in which Outlet had originally been granted a CATV franchise.

In Ducci's appeal, the court refused to hear the evidence offered by Ducci concerning the "viability" of the granted franchise and concluded that the prospective profit from a franchise not yet operative would be purely speculative; that the "viability" of a franchise is not an element pertinent to the

granting or denial of the franchise; and that Ducci accepted the franchise granted by applying to the federal communications commission for CATV authorization under it.

Certain propositions are basic to the varied issues thus presented. It is clear and uncontested that, by statutory definition, a community antenna television company (CATV) is a public service company and has been one since June 18, 1965, the effective date of No. 175 of the 1965 Public Acts, now General Statutes (Rev. to 1966) § 16-1. A certificate of public convenience and necessity issued by the commission upon written application and after a public hearing, and which may be amended, suspended or revoked by the commission, is required before a CATV system may be constructed or operated. General Statutes (Rev. to 1966) § 16-331. As a public service company, the service to be furnished by a CATV system is subject to regulation by the commission. General Statutes (Rev. to 1966) §§ 16-19, 16-20. "In determining whether a certificate shall be granted, the commission shall take into consideration the public need for the proposed service, the suitability of the applicant or, if the applicant is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested." General Statutes (Rev. to 1966) § 16-331 (b). A right of appeal to the Superior Court is granted to any party aggrieved by an order of the commission. General Statutes (Rev. to 1966) § 16-35. When an appeal is taken it becomes the duty of the commission to prepare, file with and certify to the court a copy of such portions of the record of the case as, to the commission, appear to

be pertinent to the appeal. General Statutes (Rev. to 1966) § 16-37. In each of the cases before us the Superior Court has found that the commission has filed its order of March 13, 1964, establishing construction and maintenance standards for CATV; its notice of hearing and order of July 13, 1964, establishing procedural requirements for CATV applicants; the 9481-page transcript of the testimony taken at ninety-three hearing sessions; its order of March 20, 1965, providing guides for relevant and material evidence; the exhibits submitted by all applicants and received at hearing sessions; and its order of March 21, 1967, specifically granting or denying the several CATV franchises applied for; and, in the case of Outlet, the order of January 24, 1968, revoking the franchise previously granted to that plaintiff in the order of March 21, 1967.

It thus appears that the court had before it the entire record of the proceedings before the commission during the protracted hearing on the many applications for franchises in nearly half the towns in the state. The duty then devolved upon the court to review, on the record so filed and certified, the proceedings of the commission and to examine the legality of the decision of the commission and, so far as the court had cognizance of the subject, the propriety and expediency of the decision, proceeding as in the case of complaints for equitable relief. General Statutes (Rev. to 1966) § 16-37. The court's task was to determine "on the record whether there . . . [was] a logical and rational basis for the decision of the commission or whether, in the light of the evidence, it . . . [had] acted illegally or in abuse of its discretion. . . . [Each] plaintiff has the burden of proof as to the existence of any abuse." *Anthony Augliera, Inc.* v. *Loughlin,* 149

Conn. 478, 482, 181 A.2d 596, and cases cited. "A conclusion of the commission not legally supported by the evidence would constitute an abuse of its powers. The weight and credibility of the evidence offered are, however, matters within the province of the commission." *Brook Ledge, Inc.* v. *Public Utilities Commission,* 145 Conn. 617, 619, 145 A.2d 590. Administrative or other nonjudicial duties may not constitutionally be imposed on a judge in the course of, or as incident to, judicial proceedings. *Adams* v. *Rubinow,* 157 Conn. 150, 158, 251 A.2d 49. Consequently, the statutory mandate that the court proceed as in the case of complaints for equitable relief requires only a review of the proceedings before the commission to determine whether the action appealed from was legal. *Jaffe* v. *State Department of Health,* 135 Conn. 339, 354, 64 A.2d 330; *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 550, 12 A.2d 775.

Each plaintiff asserts that the commission's report fails to "state with clarity and completeness the facts and conclusions essential to its order" and thus disabled the trial court from properly performing its function within the meaning of the rule as quoted from *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252, 140 A.2d 874. We said in that case (p. 252) that, "unless the finding shows the facts upon which the commission acted and demonstrates the reasons for its conclusions", the court cannot, on review, determine from the record "whether the facts found by the commission are supported by the record, whether they furnish justifiable reasons for the action of the commission, and whether it has acted illegally or has exceeded or abused its powers." As might be expected, none of the plaintiffs challenges

the commission's conclusion that each was financially and technically qualified. The contested issues on which a review was called for were as we have already recited.

Without our indulging in all details, the commission found, in substance, as follows. CATV is basically a master antenna service designed to provide improved television reception in areas in which reception is poor owing to geographic obstructions or distance and to improve color reception. Through receiving antennas, auxiliary electronic apparatus, and cables mounted on existing utility poles and connected to subscribers' receiving sets, as many as twelve channels of high-quality pictures originating as much as 100 miles away are made available to the viewer. CATV began about 1949 as a limited service to isolated subscribers but has become one of the fastest developing industries in the United States. In 1963, the General Assembly, by Public Act No. 425, empowered the commission to grant CATV franchises upon a finding of public convenience and necessity and, in 1965, declared a CATV system to be a public service company. The text of §§ 16-330, 16-331 and 16-332 of the General Statutes (Rev. to 1966) is set forth in full. Pursuant to those statutes, the commission, on March 13, 1964, after notice and hearing, prescribed construction and maintenance standards and terms and conditions for CATV operations. On July 13, 1964, the commission advertised statewide press notices concerning the filing of applications, and, as a result, the many applications were filed and hearings held (as already recited). Applicants were required to present comprehensive financial, technical and other data. Each applicant was required to, and did, survey the quality of the broadcasting signal re-

ceived in the area which it sought to serve. Most areas in Connecticut have had reasonably good signals from one or two broadcasting networks, but nowhere are twelve high-quality channels available. An acceptable transmission in black and white may be unsatisfactory in color. Local broadcasting channels now present acceptable pictures in a restricted area. CATV will improve this, enlarge the area for receiving local color broadcasts and make available a wider assortment of black and white signals. The public interest in these results has established a need for CATV in all the communities involved.

Each applicant was required to, and did, submit biographical data on its management, evidence and supporting data on its financial responsibility, the estimated cost of construction, the ability to raise necessary funds, the proposed date for starting and completing the work, and a projected future ten-year income statement. The applicants and their technicians testified regarding education, experience and general competence.

A television broadcasting station has a great interest in retaining its viewers because advertising accounts, programming, station and network profits are linked to the volume of viewing. The CATV customer, on the other hand, is interested in receiving the widest possible assortment of high-quality entertainment. The CATV operator chooses the available signals it sends to its subscribers. The CATV operator which has no financial affiliation with a broadcasting station is free to select for its subscribers those channels which it believes will offer the maximum of desirable viewing. If, however, the CATV operator has a financial affiliation with a broadcasting station, it may be influenced in

channel selection. Concern for this circumstance has prompted study by the federal communications commission. As a result, that body has reached a divided opinion. The decision of the majority is that the common ownership of a broadcasting station and a CATV system should be weighed with the other circumstances of each case. The minority would prohibit common ownership in order to promote healthy competition between CATV and broadcasters.

On the basis of all the evidence presented, the commission concluded that "other things being equal" the public interest would best be served by the grant of a franchise to the independent CATV operator rather than to one in which a broadcaster had a financial interest; that better service to the public would be assured through a series of relatively small independently owned CATV systems; and that the successful applicants met the statutory requirements as to financial responsibility and ability to perform efficiently.

The finding of the court clearly demonstrates that it carefully reviewed, on the record before it, the foregoing facts and conclusions reached by the commission. It concluded that the commission's decision contained a sufficient finding of facts and statement of conclusions to permit a review of the decision appealed from and that, from a review of the commission's finding and an examination of the voluminous record certified by the commission, it found support for the commission's decision. We find no merit in the claim that the commission's finding was inadequate to permit a review by the court or to support its decision.

Television and Outlet argue that, in considering the circumstance of common ownership between

broadcasters and CATV operators, the commission gave effect to a standard not embraced within General Statutes (Rev. to 1966) § 16-331. Television argues further that the commission has, in effect, illegally adopted a "rule" prohibiting common ownership. The defendants, on the other hand, assert that the commission properly considered the circumstance of common ownership in determining the suitability of the applicant as it was required to do under § 16-331, and with this argument we agree.

Television's claim is that the commission, in effect, adopted a regulation without following the procedures required by §§ 4-41 through 4-50 of the General Statutes (Rev. to 1966). Section 4-41 defines a regulation as "the whole or any part of any written statement made by any executive or legislative department or agency of general applicability, designed to . . . establish the general policy of such . . . agency, but shall not include . . . any rules, regulations, orders, . . . decisions or authorizations addressed to or served upon particular or named . . . corporations . . . and not of general applicability". The commission negated a general applicability of its treatment of common ownership when it stated that "an outright prohibition of dual ownership might be deemed arbitrary." The commission was involved in an adjudicative proceeding involving licensing applications. See 1 Davis, Administrative Law § 5.02, p. 297. The action which it announced in dealing with the cases before it was not in the nature of a "rule" of general application. See *National Labor Relations Board* v. *Wyman-Gordon Co.*, 394 U.S. 759, 765, 89 S. Ct. 1426, 22 L. Ed. 2d 709. Indeed the action complained of was stated as explanatory of "why certain applicants have been denied certificates."

No one disputes the fact that the commission was required, by General Statutes (Rev. to 1966) § 16-331, to determine the suitability of the applicant to meet the public need for the proposed service. The common meaning of "suitability" is "fitness", "qualification" or "appropriateness". Webster, Third New International Dictionary. The term is a broad one and embraces a measure of discretion. *Murphy* v. *Bergin,* 118 Conn. 249, 260, 171 A. 433. CATV, in its basic concept, has little in common with broadcasters since it simply carries, without editing, whatever program it receives. *Fortnightly Corporation* v. *United Artists Television, Inc.,* 392 U.S. 390, 400, 88 S. Ct. 2084, 20 L. Ed. 2d 1176. Bringing distant signals into an area competes with the local television broadcaster and can have a substantial negative effect on the broadcaster's audiences and revenue. *United States* v. *Southwestern Cable Co.,* 392 U.S. 157, 175, 88 S. Ct. 1994, 20 L. Ed. 2d 1001. It appears from the appendices to the briefs that the question of competition between CATV operators and broadcasters was a live issue before the commission. In its final decision and order, the commission did not, as claimed by Television, adopt a "rule" making common ownership an absolute bar. Instead, it concluded that, in the cases before it, "other things being equal, the independent owner should be favored." In short, the commission was required to decide, under the circumstances presented to it, which applicants, among the several who were financially and technically qualified, were both suitable and most likely to serve the public interest best. That was a decision called for by the commission's function. *Modeste* v. *Public Utilities Commission,* 97 Conn. 453, 460, 117 A. 494; *Norwalk* v. *Connecti-*

*cut Co.,* 89 Conn. 537, 542, 94 A. 988. And in deciding what was in the best public interest, the case of each applicant had to be decided on its own facts. *Briggs Corporation* v. *Public Utilities Commission,* 148 Conn. 678, 688, 174 A.2d 529.

The further claims made by Outlet that it was denied due process because the commission failed to disclose its "secret qualification standard", that it failed properly to apply such a standard, that the evidence did not establish that its broadcasting station would compete in its CATV franchise area, and that an appeal by another applicant prevented the commission from revoking its order are without merit. As already indicated, the matter of joint ownership of CATV and broadcasting stations was an issue before the commission in the lengthy hearing which culminated in the decision of March 21, 1967. Following that decision, in which Outlet was granted a franchise, the notice of rehearing specifically stated the issue to be Outlet's failure to meet the "standard" complained of, and that issue was contested. Outlet acknowledges that the signal from its broadcasting station is received in its sought-after franchise area and argues only that its signal is not clear and thus not "competitive". This was its claim at the rehearing, and it offered, in proof, tests made subsequent to the original order. The commission excluded the new evidence as redundant. This was not erroneous. Television went so far as to claim that its signal was not received at all. The commission has made clear, in the order revoking the franchise mistakenly granted to Outlet in the first instance, that its objective was to avoid conflicting loyalties. Obviously, since a purpose of CATV is to provide improved television reception in an area, a franchise could serve to im-

prove the reception from the television station and, with the resulting good reception, give rise to the ensuing results which the commission envisioned to be contrary to the public interest.

The notice of hearing on the revocation was issued on May 18, 1967. Substantially seven months later, on December 7, 1967, another applicant, which had been denied a franchise, petitioned the commission to vacate the notice of rehearing in Outlet's case on the ground that the commission was without jurisdiction because of the petitioner's appeal. The commission properly denied the petition for the reason that no appeal had been taken from its decision in Outlet's case. Outlet would now make that denial a ground of appeal merely because the commission's decision of March 21, 1967, disposed of all CATV applications pending before it, each of which had been assigned a separate docket number and had been decided individually. The claim is without merit.

Television and Outlet both argue that the commission was without authority to "proscribe" common ownership of broadcasting and CATV stations because the federal communications commission had preempted the field. "When Congress has exerted its paramount legislative authority over a particular phase of interstate commerce, inconsistent state laws on that subject are superseded." *Bailey* v. *Bruneau's Truck Service, Inc.,* 149 Conn. 46, 55, 175 A.2d 372. The federal communications commission is empowered by the Congress to regulate CATV systems. *United States* v. *Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S. Ct. 1994, 20 L .Ed. 2d 1001. The court, in that case, made clear, however, that it had no occasion to determine the limits of that authority and emphasized that the authority recog-

nized by its decision was "restricted to that reasonably ancillary to the effective performance of the . . . [F.C.C.'s] various responsibilities for the regulation of television broadcasting. . . . We express no views as to the . . . [F.C.C.'s] authority, if any, to regulate CATV under any other circumstances or for any other purposes." Ibid.

If we assume, without deciding, that the inclusion of common ownership among the circumstances to be considered by an administrative agency of the state in determining the suitability of competing applicants for a state franchise is within the ambit of the federal communications commission's authority, there still remains the question whether, in the cases before us, the record discloses that the federal agency has assumed authority over that subject. If it has, then that authority is supreme. *University Overland Express, Inc.* v. *Alsop,* 122 Conn. 275, 285, 189 A. 458. Whether preemption has in fact occurred depends on whether the federal authority has, in fact, regulated the area and not on whether it has the power to do so. *T.V. Pix, Inc.* v. *Taylor,* 304 F. Sup. 459, 465 (D. Nev.), aff'd without opinion, 396 U.S. 556, 90 S. Ct. 749, 24 L. Ed. 2d 746. The question must be answered by a consideration of the particular cases before us. *Head* v. *New Mexico Board of Examiners in Optometry,* 374 U.S. 424, 430, 83 S. Ct. 1759, 10 L. Ed. 2d 983. State public utility regulation of a CATV franchise is not an area of the law which inherently requires national uniformity. *T.V. Pix, Inc.* v. *Taylor,* supra, 464. Regardless of the results reached in the present cases, however, if future events or subsequent federal action demonstrates that state action thereafter encroaches upon the proper exercise of federal power, then, of course, the action of the state will be

superseded. *University Overland Express, Inc.* v. *Alsop,* supra, 287; *Lamb Enterprises, Inc.* v. *Erie,* 396 F.2d 752, 753 (3d Cir.).

Since 1960, the federal communications commission would appear to have been feeling its way in asserting jurisdiction over CATV. *United States* v. *Southwestern Cable Co.,* supra, 165. In the present appeals the record discloses that, in April, 1964, the federal communications commission sought information and comment concerning the problems involved in ownership of CATV systems or interests therein by television broadcast licensees and what action, if any, it should take with respect thereto. *Notice of Inquiry (Docket No. 15415),* 29 Fed. Reg. 5416. As a result of the inquiry it came to the conclusion, in 1965, that the danger of abuses "is not sufficiently great to warrant an overall or across-the-board prohibition against cross-ownership of CATV systems and television stations." In 1965 it issued a directive that "in the event that it is ultimately determined that the [Federal Communications] Commission has jurisdiction over all CATV systems, we do not contemplate regulation of such matters as CATV rates to subscribers, the extent of the service to be provided, or the award of CATV franchises. Apart from the areas in which the [Federal Communications] Commission has specifically indicated concern and until such time as regulatory measures are proposed, no Federal preemption is intended." *Notice of Inquiry and Notice of Proposed Rulemaking (Docket No. 15971),* 1 F.C.C.2d 453, 466. In May, 1968, it appears that "the [Federal Communications] Commission has not yet developed a long range policy regarding cross-ownership of CATV and other media of mass communications." *In re Applications of Lorain Com-*

*munity Broadcasting Co., Allied Broadcasting, Inc., Midwest Broadcasting Co. (Docket Nos. 16876, 16877, 16878)*, 13 F.C.C.2d 106, 111.

In December, 1968, it initiated a proceeding "to explore the broad question of how best to obtain, consistent with the public interest standard of the Communications Act, the full benefits of developing communications technology for the public, with particular immediate reference to CATV technology and potential services, and the nature of any regulations and/or proposed legislation that may be necessary or desirable to further this goal." The hope was expressed that the proceeding would "provide meaningful and practical assistance to its consideration of regulatory problems which may require resolution within the next decade or so." And it declared that any of the matters encompassed in the proceeding "may be the subject of rule making actions."

A long and exhaustive consideration of the immediate problems involved resulted. Included, was the statement that local entities, state or municipal, "should—among other things—be concerned with various licensing considerations pertinent to the public interest judgment to be made by the local authority" and, interestingly enough, suggesting guidelines substantially identical to those embodied in General Statutes (Rev. to 1966) § 16-331. Also included, was the statement: "We are proposing, first, to prohibit cross-ownership of television broadcast stations and CATV systems within the station's Grade B contour." Comment was invited, however, as to whether some other area should be designated. After twenty-five pages of complex and often inconclusive discussion, which "merely touches on some of the questions which occur to us initially" and which ranges "over a broad field . . . difficult to

assess at this time", it is concluded that "a continuing inquiry is needed", and "to inaugurate the discussion, interested persons are invited to comment on the questions indicated". *Notice of Proposed Rulemaking and Notice of Inquiry (Docket No. 18397)*, 15 F.C.C.2d 417.

The action of the federal communications commission would thus indicate that it contemplates no effort to regulate the award of a state CATV franchise and that, in the areas in which it has indicated concern (which include common or cross ownership), it has not, in fact, adopted a regulation regarding the common ownership of CATV systems and broadcasting stations. *T.V. Pix, Inc.* v. *Taylor,* 304 F. Sup. 459, 464 (D. Nev.), aff'd without opinion, 396 U.S. 556, 90 S. Ct. 749, 24 L. Ed. 2d 746. Consequently, we find in the record before us no support for a claim of preemption by the federal authorities.

In addition to the claim that the commission had failed to set forth facts to support its decision and to permit a review by the court which we have already discussed, Ducci claims that the commission acted unlawfully, arbitrarily and in abuse of its discretion in granting a franchise to Ducci in an area for which it did not apply and in denying a franchise in two of the towns for which it did apply. On this issue the court concluded that the commission "gave notice at its hearings that towns might be awarded an applicant in its franchise, for which it had not applied." See *Chicago, St. P., M. & O. Ry. Co.* v. *United States,* 322 U.S. 1, 4, 64 S. Ct. 842, 88 L. Ed. 1093. Ducci attacks the commission's statement that, in reviewing the requests of the various applicants relating to the towns each proposed to serve, it had concluded "that some modifications of

their proposals are necessary in order to best serve the public interest and to establish more viable systems. Therefore, the Commission in allocating the areas of the state for which applications have been received has assigned some towns to applicants that had either been requested by another or for which no application has been made." The sense in which the commission used the word "viable" does not appear. Webster's Third New International Dictionary defines "viable" to mean "capable of growing or developing . . . workable . . . capable of existence and development as a relatively independent social, economic, or political unit."

Ducci's argument is that, unless disproportionate rates were charged to subscribers in the franchise area which was assigned to it, the operation would not be profitable, and Ducci complains of lack of due process in that the commission failed, and the court refused, to hear evidence to establish the unprofitable character of the assigned area. As we have already stated, the commission required each applicant to submit data concerning its management, financial responsibility, the estimated cost of establishing the CATV system, the ability to raise the necessary funds, the proposed dates for starting and completing the work, the projected future ten-year income from the system, and evidence concerning technical competence. If the commission had been engaged in fixing rates, the question of a fair return on Ducci's investment would have been material. *New Haven* v. *New Haven Water Co.*, 118 Conn. 389, 401, 172 A. 767. This was not such a proceeding, however, and the record fails to disclose the lack of due process before the commission which is now complained of. At the hearing before the trial court on the appeal, Ducci sought to offer evidence on the

"viability" issue only to the extent of requesting the court to take judicial notice of the population of the towns of Goshen, Barkhamsted and New Hartford and of offering state highway department records concerning the total number of state and town roads in these towns. It was not a denial of due process to refuse this offer of evidence to supplement the certified record of the commission. Furthermore, we cannot disagree with the court's conclusion that, since no rate-making issue was involved, the "viability" when interpreted to mean "profitability" of the franchise was not an element pertinent to the granting or denial of the franchise.

It is unnecessary to discuss Ducci's further claim that it did not accept the franchise granted by the commission by applying, subsequent to filing the appeal in the present case, to the federal communications commission for a CATV authorization under the franchise.

There is no error in any of the three cases.

In this opinion the other judges concurred.